Dirk O. Julander, Bar No. 132313
  doj@jbblaw.com
Catherine A. Close, Bar No. 198549
  cac@jbblaw.com
JULANDER, BROWN & BOLLARD
9110 Irvine Center Drive
Irvine, California 92618
Telephone:  (949) 477-2100
Facsimile:  (949) 477-6355

Attorneys for Plaintiff RODAN INDUSTRIES, INC. f.k.a. U.S. SENSOR CORP.

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

| | |
|---|---|
| RODAN INDUSTRIES, INC. f.k.a. U.S. SENSOR CORP., a California corporation,<br><br>Plaintiff,<br><br>vs.<br><br>LITTELFUSE, INC., a Delaware corporation,<br><br>Defendant,<br><br>and BANK OF AMERICA, N.A.<br><br>Nominal Defendant. | Case No.<br><br>**COMPLAINT FOR:**<br><br>1. **Breach of Contract;**<br>2. **Contractual Indemnity; and**<br>3. **Declaratory Relief** |

RODAN INDUSTRIES, INC. f.k.a. U.S. SENSOR CORP. ("Rodan" or "Plaintiff") alleges for its Complaint against LITTELFUSE, INC. ("Littelfuse") and nominal defendant BANK OF AMERICA, N.A. ("BOA") as follows:

## PARTIES

1. Plaintiff is, and at all relevant times was, a corporation duly organized and existing under and by virtue of the laws of the State of California with its registered office in Anaheim, Orange County, California.

2. Defendant Littelfuse is, and at all relevant times was, a corporation duly organized and existing under and by virtue of the laws of the State of Delaware with its principal place of business in Chicago, Illinois.

3. Nominal defendant BOA is a national banking association duly organized and existing under and by virtue of the laws of the United States of America with its headquarters in North Carolina.

## JURISDICTION AND VENUE

4. This Court has jurisdiction over this matter under 28 U.S.C. Section 1332(a)(l) on the basis of diversity of citizenship, because the amount in controversy exceeds $75,000.00, the parties are citizens of different states, and there is an actual controversy between the parties.

5. Venue is proper in the Central District of California based on the forum selection clause contained in the agreement which is the subject of this action. That clause provides, in relevant part (capitalization in original):

> ANY LEGAL SUIT, ACTION OR PROCEEDING ARISING OUT OF OR BASED UPON THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY MAY BE INSTITUTED IN THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA OR THE COURTS OF THE STATE OF CALIFORNIA IN EACH CASE LOCATED IN THE COUNTY OF ORANGE, AND EACH PARTY IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF SUCH COURTS IN ANY SUCH SUIT, ACTION OR PROCEEDING. . . . THE PARTIES IRREVOCABLY AND UNCONDITIONALLY WAIVE ANY OBJECTION TO THE LAYING OF VENUE OF ANY SUIT, ACTION OR ANY PROCEEDING IN SUCH COURTS AND IRREVOCABLY WAIVE AND AGREE NOT TO PLEAD OR CLAIM IN ANY SUCH COURT THAT ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

## FACTUAL BACKGROUND

### *Background Regarding U.S. Sensors*

6. After getting out of the Army in 1966, Roger Dankert embarked on what would become a life-long career in the thermistor industry. A thermistor (the name is a combination of thermal and resistor) is a type of resistor whose electrical

1  resistance is dependent on changes in temperature. Thermistors are widely used in
2  electronic applications where greater precision within a limited temperature range in
3  necessary.
4        7.    Mr. Dankert's success led him to start companies in 1970 and 1983
5  manufacturing an extensive line of thermistors and thermistor assemblies. Both
6  companies were both successfully sold to NYSE listed public companies in 1976
7  and 1987, respectively.
8        8.    In 1989 Mr. Dankert founded U.S. Sensor Corp. to build specialty
9  higher price and higher profit margin sensors and sensor assemblies and sell them
10 for use in difficult applications where extreme environmental and physical stresses
11 needed to be withstood. U.S. Sensor manufactured thermistors and probe assemblies
12 used in the most demanding temperature sensing applications in industries ranging
13 from automotive, consumer electronics, food handling and processing to medical
14 electronics, military/defense and aerospace. A mark of its success was achieved
15 when U.S. Sensor's quality system was ISO 9001:2008 certified by International
16 Organization for Standardization (ISO), the world's largest developer and publisher
17 of International Standards.
18       9.    U.S. Sensor used proprietary state-of-the-art processing techniques to
19 manufacture its products, which became known for their long term reliability and
20 precision. For example, it was a U.S. Sensor thermistor that helped fix the problems
21 Boeing was experiencing with fires in the lithium-ion battery packs of its 787 jet
22 airliners in 2013. In another specific case, U.S. Sensors saved its customer,
23 Waterpick, over $1,000,000 per year in warranty expenses after it redesigned a
24 failed product used in swimming pools and spas. U.S. Sensor never had a request for
25 credit due to a failure of this product. In another case, U.S. Sensor designed a
26 special sensor for Carrier Corp. when it was having problems with manufacturing
27 wall thermostats for their air conditioning systems due to too much lag in room
28 temperature sensing. In all of its products, the company always stressed quality,

timeliness and expert customer service. Mr. Dankert also ensured that U.S. Sensor's employees were treated with great respect and participated in the company's success with generous year-end bonuses.

10. Beginning in 2015, Littelfuse began courting Mr. Dankert to acquire U.S. Sensor. The parties failed to reach an agreement when Mr. Dankert terminated the negotiations with Deepak Nayar, General Manager of the Electronics Business Unit at Littelfuse and its Senior Vice President. In 2017, Dave Heinzmann, Littelfuse's President and CEO, reached out to Mr. Dankert and restarted the acquisition negotiations. It was important to Mr. Dankert that, if U.S. Sensor was sold, the buyer would remain true to the company's values and high standards that he worked so long and hard to establish.

11. Mr. Heinzmann convinced Mr. Dankert that Littelfuse shared the same values and would preserve the character and culture of U.S. Sensors that Mr. Dankert had fostered. Mr. Dankert eventually agreed and, on or about July 6, 2017, Littelfuse purchased substantially all of the assets of U.S. Sensor. The purchase included the name of the company, U.S. Sensor, and as a result the company thereafter changed its name to Rodan Industries, Inc., Plaintiff in this action.

12. After the asset purchase, Mr. Dankert stayed on as a consultant until January 2019 to assist with the transition. Unfortunately, the new regime headed by Mr. Nayar, did not consult with Mr. Dankert, keeping him in the dark regarding major issues and ignoring his advice on others. As a result, employees left, customer satisfaction waned, product quality diminished and the business suffered as a result. By the time Mr. Dankert retired in January 2019 at the end of his consulting agreement, customer quotations were taking weeks instead of days and product deliveries were late for almost every customer, sometimes by many months. Mr. Dankert was also receiving calls from customers asking for help, but there was nothing he could do.

///

### *The Asset Purchase Agreement and Escrow Agreement*

13. In connection with the asset purchase by Littelfuse, the parties executed an Asset Purchase Agreement (the "APA"). The APA provided that $5,000,000 of the purchase price would be deposited in an escrow account and distributed according to the terms of an Escrow Agreement to be executed upon the closing of the transaction and attached as Exhibit A to the APA.

14. Pursuant to Section 2.05 of the APA:

> The Purchase Price shall be paid as follows:
>
> (a)  The purchase price less the Escrow Amount shall be paid by wire transfer of immediately available funds to an account designated in writing by Seller to Buyer no later than two Business Days prior to the Closing Date; and
>
> (b)  The Escrow Amount shall be deposited by wire transfer of immediately available funds into an account designated by the Escrow Agent and shall be held and distributed in accordance with the terms of the Escrow Agreement to satisfy (i) any adjustments to the Purchase Price in favor of Buyer pursuant to Section 2.06(a); and (ii) any and all claims made by Buyer or any other Buyer Indemnitee against Seller pursuant to Article VII.

15. The parties selected BOA's office in Chicago, Illinois as the escrow agent to hold the $5,000,000 escrowed funds (the "Escrow Fund"). The Escrow Fund was deposited with BOA on or about July 6, 2017.

16. Under Section 7.04(c) of the APA and Section 3.5 of the Escrow Agreement, Plaintiff and Littelfuse agreed that, "the Escrow Fund may be held in escrow until July 6, 2019 ('Escrow Release Date'), subject to" the "resolution of Claims" as provided in Section 3 of the Escrow Agreement.

17. Under Section 3.2 of the Escrow Agreement, to assert a claim to any portion of the Escrow Fund, Littelfuse was required to "give notice (a 'Notice') to the Seller and the Escrow Agent specifying in reasonable detail the nature and dollar amount of any claim it or another indemnitee may have under Section 7.02 (Indemnification by Seller) of the Purchase Agreement (each a 'Claim')." Section 3.2 gave Plaintiff the opportunity to dispute any claim within 30 days of receipt.

18. Prior to the Escrow Release Date, no "Claims" had been made by Littelfuse under Section 7.02 of the APA.

19. Insofar as the Escrow Release Date had come and gone with no Claims from Littelfuse, on July 8, 2019, Plaintiff forwarded to Littelfuse and BOA a signed Disbursement Request pursuant to section 3.1 of the Escrow Agreement. On that same date, Plaintiff received a call from BOA's escrow agent indicating that the paperwork necessary to release the now $5,004,761.36 Escrow Fund to Plaintiff was prepared and that it was only waiting for Littelfuse's signature authorizing the disbursement to Plaintiff.

20. Also on July 8, 2019, after receiving the call from the BOA escrow agent, Plaintiff sent an email to Littelfuse inquiring as to the timing on its execution of the Disbursement Request. In response, Littelfuse indicated that it was "investigating potential claims" and that, "[a]s a result, Littelfuse is not in a position at this time to release the remainder of the escrow funds presently held."

21. On July 16, 2019, through its counsel, Plaintiff again formally demanded that Littelfuse authorize the release of the Escrow Fund. As of the filing of this Complaint, Littelfuse has not responded.

22. BOA is currently the depository for the Escrow Fund. It holds the Escrow Fund, which is the subject matter of this action, in a possessory capacity as to which there is no dispute. BOA is named as a nominal defendant in this action purely as a means of facilitating collection of the Escrow Fund, and not due to any act or omission on BOA's part. The following claims and prayer for relief are therefore not directed at BOA.

## FIRST CAUSE OF ACTION
### (Breach of Contract)

23. Plaintiff refers and incorporates by reference the allegations of paragraph 1 through 22 as though set forth fully herein.

///

24. The APA and the accompanying Escrow Agreement attached as Exhibit A to the APA (collectively the "Agreements") are valid and binding contracts.

25. Under the Agreements, Littelfuse was required to authorize the distribution of the Escrow Fund to Plaintiff on July 6, 2019.

26. On or about July 8, 2019, Littelfuse breached the Agreements by failing and refusing to authorize BOA to release the $5,004,761.36 Escrow Fund to Plaintiff.

27. Plaintiff has performed all of the obligations required of it under the Agreements.

28. As a direct and proximate result of Littelfuse's breach of the Agreements, Plaintiff has suffered damages of $5,004,761.36, plus prejudgment interest on such amount from July 7, 2019 to the date of entry of judgment pursuant to California Civil Code Section 3289.

29. Plaintiff is alternatively entitled to a Court Order commanding Littelfuse to specifically perform its obligation and execute all paperwork required by BOA to release the Escrow Fund to Plaintiff.

## SECOND CAUSE OF ACTION
### (Contractual Indemnification)

30. Plaintiff refers and incorporates by reference the allegations of paragraph 1 through 29 as though set forth fully herein.

31. Section 7.02(b) of the APA requires Littelfuse to indemnify Plaintiff and "pay and reimburse" Plaintiff for any and all "Losses" incurred or sustained with respect to "any breach or non-fulfillment of any covenant, agreement or obligation to be performed by Seller pursuant to this Agreement, the other Transaction Documents to which it is a party, or any certificate or instrument delivered by or on behalf of Seller or the Shareholders pursuant to this Agreement."

///

1      32. The foregoing "indemnification" provision is not limited to third-party claims, which are instead addressed in section 7.02(d).

    33. Under the APA, "Losses" are defined broadly to include "costs or expenses of whatever kind, including reasonable attorney's fees and the cost of enforcing any right to indemnification hereunder…"

    34. As a result of Littelfuse's failure and refusal to authorize the disbursement of the Escrow Fund to Plaintiff, it has been necessary for Plaintiff to retain legal counsel to file and prosecute this action. Pursuant to the APA, Littelfuse is required to pay and reimburse Plaintiff for its attorney's fees and costs reasonably incurred in prosecuting this action in an amount to be determined at the time of trial.

## THIRD CAUSE OF ACTION

### (Declaratory Relief)

    35. Plaintiff refers and incorporates by reference the allegations of paragraph 1 through 34 as though set forth fully herein.

    36. There exists an actual, present and justiciable controversy between Plaintiff and Littelfuse with respect to their rights, duties, and obligations under the terms of the Agreements.

    37. Plaintiff contends that, under the terms of the Agreements, Littelfuse is required to authorize BOA to disburse the entire Escrow Fund to Plaintiff. Plaintiff further contends that the deadline for Littelfuse to assert "Claims" to any portion of the Escrow Fund has passed and, therefore, the Escrow Fund is no longer available to satisfy any Claims Littelfuse believes it may have against Plaintiff.

    38. Plaintiff is informed and believes that Littelfuse contends that it is not required to authorize the disbursement of the Escrow Fund to Plaintiff.

    39. A judicial declaration is necessary and appropriate to determine the parties' respective rights, duties and obligations under the Agreements and to advise the escrow holder, BOA, with respect to the disbursement of the Escrow Fund.

///

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment on its Complaint against Littelfuse as follows:

1. For an award of damages an amount not less than $5,004,761.36;

2. Alternatively, for a Court Order compelling Littelfuse to specifically perform its obligations under the APA and related Escrow Agreement by authorizing the release of the Escrow Fund to Plaintiff;

3. For the recovery of Plaintiff's reasonable attorney's fees and costs of suit incurred herein pursuant to paragraph 7.02 of the APA in an amount to be determined at the time of trial;

4. For a judicial declaration that Plaintiff is entitled to the full Escrow Fund and that Littelfuse is required to immediately authorize BOA to disburse the entire Escrow Fund to Plaintiff. In the alternative, for a Court Order authorizing nominal defendant BOA to disburse the entire Escrow Fund to Plaintiff;

5. For pre-judgment interest on $5,004,761.36 at the rate of 10% per annum from July 7, 2019 through the date of entry of judgment pursuant to California Civil Code Section 3289;

///
///

1  6. For post-judgment interest on the total amount of the Judgment from the date of Judgment until paid in full; and

3  7. For such other and further relief as the Court may deem just and proper.

DATED this 24th day of July 2019.

JULANDER, BROWN & BOLLARD

By: _____
Dirk O. Julander (Bar No. 132313)
*doj@jbblaw.com*
9110 Irvine Center Drive
Irvine, California 92618
Phone: (949) 477-2100

Attorney for Plaintiff RODAN INDUSTRIES, INC. f.k.a. U.S. SENSOR CORP.